### I. J. MILLER AND GUSTAV TAFEL, TRUSTEES, v. W. H. ELDER ET AL.

1. TRUSTEE HAS CLAIM ON PROPERTY IMPROVED BY ADVANCEMENTS FROM HIS OWN FUNDS, WHICH PASSES TO ASSIGNEE:

While it is the law that where a trustee, like the Archbishop of the Roman Catholic Church, holding the legal title to real estate, but which in fact is held by him as trustee and for the benefit of a particular church, congregation, society, school or seminary, "has made advances from his own private means, otherwise than as donations, to assist in buying or improving the trust property, he has a claim upon the particular property so purchased or improved, which passes to his assignee in insolvency as individual assets," and in such case the burden is on such assignee to show that such advances were not made as donations, but with an expectation of re-payment. And it should also appear from accurate accounts kept by the trustee, or when, as here, the action is on behalf of creditors, it should be shown with reasonable certainty that such advances were made and the character of them.

2. WHERE IT IS REASONABLY CERTAIN THAT ADVANCES WERE FROM FUNDS OF DEPOSITORS, COURT MUST REGARD THEIR RIGHTS.

When in a case like this, it appears that no such accounts have been kept through a period of more than forty years, but it is reasonably clear from all of the evidence that large sums, at various times, must have been advanced, which could only have come from loans made to the archbishop by those who are now asserting these claims through the assignees in insolvency, the court should have regard to their rights, and from the best evidence in the case as to the amount of the advances so made, other than as donations, find the amount of the same, and subject the particular estate for whose benefit they were made, to the payment thereof.

3. INTEREST NOT ALLOWED WHERE DEPOSITORS DID NOT KNOW OF ADVANCES, EXCEPT FROM TIME OF DEMAND.

Where such advances have been made during a period of forty or fifty years prior to such assignment, and during this time the trustee, as bishop and archbishop of the diocese, holding the legal title to all the real estate in question, had the supreme control thereof, and such advances, and improvements made upon the trust property, were made without any agreement or understanding with the respective congregations or societies, as to the re-payment of such advances, and in many cases, the amounts thereof were unknown to the beneficiaries, and no demand (except in a single instance), was ever made by such bishop for re-payment, in such case interest will not be charged on such advances from the time they were severally made, but from the time demand was made therefor, viz., from the bringing of this action.

Appeal from the Court of Common Pleas of Hamilton county.

SMITH, J.

We propose to state as briefly as may be, the conclusions to which we have arrived in this case.

First—We may say, that although we have given many days to the examination of the several reports of Judge Huston, the master who was appointed by our predecessor, the district court of this county, to find and report the amounts due to John B. or Edward Purcell, on account of advances to any of the churches or other property "mentioned" in the decree then made,—the evidence taken in the original case and that before the master, and have carefully considered the oral and written arguments of counsel, yet we are compelled to say, that owing to the fact that the evidence is so voluminous, covering thousands of written and printed pages, and involving the examination of many books of account and exhibits, and on the questions in dispute, is of such a confused, contradictory and uncertain character, that we have found it almost impossible to reach a conclusion satisfactory to our own minds.

Second—As the master was an officer of the court, exercising judicial functions, and gave many months to the examination of the case, and took a large amount of testimony himself, and during this protracted hearing had the assis-

tance of counsel familiar for years with litigation, we have felt that his conclusions thus carefully arrived at, should not lightly be disturbed by us, who have not had so favorable an opportunity to arrive at a correct conclusion as to the questions in dispute.    We have felt bound, therefore, to accept his findings as right, unless they have been excepted to, and our examination of the evidence, and of the law applicable thereto, has convinced us that they are erroneous.

Third—Several propositions of law and of fact must be considered to have been settled in this case, and among them are these—that while, as found by the district court, and affirmed by the supreme court, the legal title to all of the church property now in dispute before us, was in John B. Purcell, who was the arch-bishop of the diocese of Cincinnati, he in fact only held the same as a trustee for the particular church, society, school or seminary, which was the true beneficiary, and to the use of which, the property in effect had been dedicated.   And that when such trustee had made reasonable and proper advances from his own private means, otherwise than as donations, to assist in buying or improving the trust property, it is bound therefor; Mannix v. Purcell, 46 O. S., 102.   But while this is so, we think that the law is clear, that the burden is on the trustee, or on those claiming under him, when seeking to enforce such charge against trust estates like these, held and dedicated to religious and charitable uses, and erected and maintained in part by contributions from their friends, to show by a prepon-derance of the evidence, that such advances were in fact made, not as donations, but with the expectation that they were to be repaid to him.    And it is also requisite in such case, that the trustee should show, either that he kept accurate accounts of such dealings with the trust estate, or in default of this, that it other-wise be clearly, or with reasonable certainty, made to appear that such loans were made, and the amount and character of them.

It can not be denied that in this case it appears that so far as regards the keeping of any accounts between the trustee and these several trust estates, that there was an astonishing failure to comply with this natural and reasonable re-quirement.    Though very large sums, during many years, were being received from a variety of sources, and expended in numberless ways, no book of accounts, or any account worthy of the name, appear to have been kept by the trustee in rela-tion thereto, or by those to whom he committed the management of these secular interests.    But notwithstanding this, we can not fail to be impressed with the fact, that for many years the archbishop was putting large sums of money into these various religious and charitable institutions, far exceeding in amount the aggregate sums contributed to him by the respective congregations or institutions, or their especial patrons, and that contributed by charitable persons at home or abroad, to be used by the Archbishop in such manner, for the benefit of the church as he might deem best.   And there is no escape from the conclusion that the residue needed for these great churches and institutions must have come in great part from those moneys loaned to the Archbishop or his brother, Father Purcell (who represented him), during all those years.    And surely, on principles of equity and justice, whatever of the money of these depositors has gone to the purchase and im-provement of these several trust estates, and can be traced there with reasonable certainty, and which has not been repaid, would appear to be a burden on the property itself in the hands of the beneficiaries, under ordinary circumstances, in favor of the trustee who so invested it.    And still we recognize the justice of the rule, which requires that in the absence of accurate books of account showing the dealings of the trustee with his trust estate, or other convincing evidence showing the liability of the estate to him for advances made by way of loans, that all doubts as to such liability are to be resolved against the trustee, or those claim-ing under him, when seeking, (particularly after a lapse of many years), to en-

force a liability against the trust property for such asserted loans made to or for its benefit.

While, as we have said, there is a want in this case of satisfactory evidence, both on the question of the amount of moneys advanced to these several trust estates, and whether they were intended as loans or donations, yet there are facts disclosed which convince us that even on the principles of law referred to, we should hold in conformity with the finding of the master, that the trustee did advance for the purpose of these several trust estates, very considerable amounts of money, during many years, from his own funds—that is from money which had not been contributed by these beneficiaries themselves, or by charitable persons throughout the world, to be used by the Archbishop for religious and charitable uses, as he might deem best, but which in fact came from money borrowed by the Archbishop. During all these years, the Archbishop, through his brother, Father Edward Purcell, was acting as banker of hundreds of members of his flock, who had the utmost confidence that their money, with interest thereon, would be returned to them on demand. And doubtless the moneys so received, or some of it, together with that received from other sources, went to the purchase of the real estate and the improvement thereof; and when it appears in any particular case that such purchase and improvements could not have been paid for by the contributions of the several *cestuis que trustent* themselves, or from money received from charitable persons, it must seem reasonable and certain, that the balance must have been paid from the moneys thus loaned to the Archbishop; for he had no other means from which it could be done. It can hardly be supposed either, that the Archbishop intended that any money from such a source, that is, money actually borrowed by him from persons who trusted him as a man and a high official of the church which they loved, should be a donation to the church or society to which it was advanced. No one, so far as we know, ever questioned the honesty of the Archbishop. He must, as an honest man, have intended that any advances made from this source should be repaid, and that, as he held the title thereto, it would be a charge thereon, and under his full control, and good conscience requires this now. And as an evidence of this intention and understanding of the Archbishop, it appears that in January, 1879, when overwhelmed with the announcement, that without his knowledge, liabilities had been incurred by him to these despositors to an enormous amount, but not knowing or appreciating anything like the extent of this liability, but feeling that the property held by him should respond to the payment of these debts, acting under the advice of high officials of his diocese and many laymen of high standing, with the view of obtaining a loan of $700,000, which it was hoped would enable him to meet these liabilities, he executed to Fathers Quinn and Albrink, two of the priests of the diocese, and to other friends, a mortgage to secure bonds to that amount, on property held by him as Archbishop, and among the rest on the whole of the cathedral property, including the espiscopal residence, and the cathedral school. and on all of the real estate of Mt. St. Mary's Theological Seminary, these being three of the parcels of property in controversy here, thus recognizing to some extent the liability of these and the other lands included in the mortgage, for these debts. But when the true amount of these obligations was ascertained, and it was seen that this sum was utterly inadequate to accomplish the result intended, it was abandoned, and a general assignment was made by the Archbishop, of everything he had a right to assign, to an assignee for the benefit of his creditors, and hence this litigation.

Fourth—We have had much concern as to the rule which should be adopted in this case as to the allowance of interest on sums shown to have been advanced by the trustee for the benefit of these several trust estates. The rule adopted by the master was, to allow such interest from the time the advances were made,

to the date of the assignment by the Archbishop in March, 1879, and to credit the trust property with interest on all repayments or other credits to which it was entitled, from the time they should have been credited, up to the date of the assignment, and doubtless with the idea on his part that the balance thus shown would bear interest from that date. It will be seen from the account as thus stated by him, that this results in charging the several parcels of trust property with an enormous sum of interest, amounting to far more than the principal itself, the time for which interest is calculated in some instances being nearly forty years. And if the principle adopted is correct, so far as we can see, the interest will not stop at the date of the assignment, but the whole of the principal sum would have to bear interest from that time to the present in addition—a period of more than thirteen years, which again would nearly double the debt.

Such a mode of stating the account would be so disastrous to the trust property and to the beneficial owners of it, and in this particular case be so opposed to our ideas of justice and right, that we are unwilling to give it our sanction, if the law will at all justify us in refusing to do so.

The facts are these: The title to all of this property was in the Archbishop, apparently without any limitation or qualification of his right to use, control, or alien it as he saw proper, and without any let or hindrance on the part of those who in reality had rights therein as the beneficiaries of the trust. The purchases and improvements were made by him, the beneficiaries doing what they could to furnish the means therefor. The property itself, during all of the time, was under the almost absolute control of the Archbishop, the trustee. Doubtless in all of the cases we are investigating, advances entirely proper were made by him for the purchase and improvement of the property, and in only a very few instances, and in but one of these trusts, were they made at the instance of the beneficiaries, or with their expressed approval, or was any note or evidence of indebtedness given by them or on their behalf, or even a charge made against the trust property therefor. Not even a notification appears to have been given to the beneficiaries that such advances were to be repaid, or any demand, except in a single case, ever made for the repayment of such advance, or any suggestion that interest was to be charged thereon. To come in then, thirty or forty years afterwards, with a claim not only for the principal advanced, but for interest on the same for all of these years, would, if allowed, practically eat the heart out of the trust property, and would be contrary to our sense of justice and right, and we think it is not authorized by law.

We are of the opinion that neither the general doctrine of the law, or the provisions of our statute require it. The act of January 12, 1824, [S. & C. 742,] continued in force until October 1, 1869, and pointed out the cases in which interest was payable, viz., on bonds, bills, promissory notes and other written instruments and contracts for money or property, and "on all balances due on settlement between parties thereto, or moneys withheld by unreasonable and vexatious delay of payment," and on all judgments and decrees for the payment of money. The act of May 4, 1869, which took effect October 1, 1869, [66 O. L., 91], and which was substantially brought into the Revised Statutes in 1880, (sec. 3179 and post.) made many slight alterations in the law of interest, but we do not understand that it substantially changed it as to the matter under consideration. By sec. 3181 it provided the rule for the future, that interest should be chargeable "upon any book account, on settlement hereafter made between the parties upon all verbal contracts hereafter entered into," and by sec. 3182 it is provided that interest shall be collectible, (among other things), "upon all balances struck on settlements heretofore made, upon book accounts heretofore accrued, upon all verbal contracts heretofore made" * * * "precisely as if this act had not passed." There never was any settlement between these parties, or any balance struck or agreed to between them, and there was no "unreasonable or vexatious delay of payment," for no notification of the amount claimed was ever given, or demand made therefor, and we are unable to see any provision of the statute which requires interest to be paid before such a demand in a case like this—and, except in the case of the St. Patrick's church of Cumminsville, where there was a demand ·

97                      Miller and Tafel v. Elder.

for the balance then claimed to be due, we do not find any requirement or warrant of law for allowing interest before such demand, which in this case we find was by the filing of the petition on January 7, 1880.

As this question of interest is to be decided by the statutory provisions in regard to it, it is unnecessary to consider what the decisions of the courts of other states may have been. But that, in the absence of a statute requiring it to be done in a case like this, it would not be allowed, we think is shown by the authorities cited by counsel for defendants.

See 3 Blatchford, 325, 351, 353, 355; 8 Price, 416; 33 Ill. 575; 22 Pick. 291, 294.

Fifth—Guided then by these principles, we proceed to the examination of the account stated by the master as to these several trust estates.

Mem.—The opinion and finding of the court as to the state of the account, and the amount due from the several churches, congregations and institutions, need not here be given.

S. A. Miller, attorney for Miller and Tafel, Trustees.

Stephens & Lincoln, Alfred Yaple, and Gov. Foraker, for defendants.